UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____X

ANASTACIA SYMONE,

    Plaintiff,

    -against-

THE CITY OF NEW YORK; NYPD CAPTAIN ABRAHAM
BADILLO (TAX REG. NO. 936162); NYPD OFFICER JARVIS
ONABANJO (TAX. REG. NO. 959010); NYPD LIEUTENANT
TONY IP (TAX REG. NO. 949749); NYPD SERGEANT SASHA H.
ROSEN (TAX REG. NO. 929087); NYPD LIEUTENANT DAVID A.
LAMARRE (TAX REG. NO. 947929); NYPD SERGEANT MARC H.
ASSAEL (TAX REG. NO. 960179); NYPD MEMBER DOES 4-20;
NYPD COMMISSIONER KAZ DAUGHTRY; NYPD OFFICER
AHMED N. ALI (TAX REG. NO. 970381); NYPD SERGEANT
STANISLAV KUSHNIR (TAX REG. NO. 947764); NYPD
DETECTIVE MATTHEW COFFARO (BADGE NO. 3042); NYPD
OFFICER WOODLY SAINROSE (TAX. REG. NO. 975790); NYPD
SERGEANT JOEL MOTTOLA (TAX REG. NO. 950922),

    Defendants.

_____X

**SECOND
AMENDED
COMPLAINT**

**Docket No.:**
**25 CV 10379**

**JURY TRIAL
DEMANDED**

Plaintiff ANASTACIA SYMONE, by and through their attorneys, THE ABOUSHI LAW

FIRM PLLC, COHEN&GREEN P.L.L.C. and GIDEON ORION OLIVER hereby complains of

Defendants as follows:

<strong><u>JURISDICTION AND VENUE</u></strong>

1. Plaintiff brings this action pursuant to 42 U.S.C. § 1983, the First, Fourth, and Fourteenth

Amendments to the United States Constitution, and New York State and City law.

2. This Court has jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1343,

and 1367, and 42 U.S.C. § 1983.

1

3. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where Plaintiff Symone resides, Defendant City of New York has offices, and all the actions complained of herein occurred.

4. As Plaintiff alleges that Defendants violated their rights guaranteed under the laws of the State of New York, the Court has jurisdiction over those claims arising under the laws of the State of New York, by and through 28 U.S. § 1367(a).

5. Plaintiff makes allegations related to three incidents concerning the dates May 6, 2023, April 30, 2024, and March 11, 2025. Plaintiff timely served Notices of Claim on the municipal Defendant for malicious prosecution and denial of fair trial related to their April 30, 2024 incident, and for all claims related to their March 11, 2025 incident and complied with all conditions precedent to commencing an action under state law.

6. At least thirty days have elapsed since service of Plaintiff's Notices of Claim and adjustment and payment thereof has been neglected or refused.

7. This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York state law.

## PARTIES

8. At all times mentioned herein, Plaintiff ANASTACIA SYMONE (Mx. Symone; they/them) was a resident of Bronx County in the City and State of New York.

9. At all relevant times mentioned herein, Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

10.       *Defendants related to the May 6, 2023 Incident:*

2

i. Defendant NYPD Captain Abraham Badillo (NYPD Tax Registration Number 936162) was at all times relevant to this Complaint a member of the NYPD. Captain Badillo is currently assigned to Housing PSA 1. At the time of the May 6, 2023 Incident, Defendant Badillo was an NYPD Lieutenant. Defendant Badillo is sued herein in his official and individual capacities.

ii. Defendant Police Officer Jarvis Onabanjo (NYPD Tax Registration Number 959010), was at all times relevant to this Complaint a member of the NYPD. Officer Onabanjo is currently assigned to Strategic Response Group 1 in Manhattan. Defendant Onabanjo is sued herein in his official and individual capacities.

iii. Defendant Lieutenant Tony Ip (Tax Reg. No. 949749) was at all times relevant to this Complaint a member of the NYPD. Lieutenant Ip is currently assigned to the 62nd NYPD Precinct. Defendant Ip is sued herein in his official and individual capacities.

iv. Defendant Sergeant Sasha H. Rosen (Tax Reg. No. 929087) was at all times relevant to this Complaint a member of the NYPD. Sergeant Rosen is currently assigned to the NYPD's Vice Unit. Defendant Rosen is sued herein in his official and individual capacities.

v. Defendant NYPD Lieutenant David A. Lamarre (Tax Reg. No. 947929) was at all times relevant to this Complaint a member of the NYPD. Lieutenant Lamarre is currently assigned to the NYPD's Queens Strategic Response Group. Defendant Lamarre is sued herein in his official and individual capacities.

vi.   Defendant Sergeant Marc H. Assael (Tax Reg. No. 960179) was at all times relevant to this Complaint a member of the NYPD. Sergeant Marc. H. Assael is currently assigned to the NYPD Police Academy. Defendant Assael is sued herein in his official and individual capacities.

11.      *Defendants related to the April 30, 2024 Incident:*

i.   NYPD Commissioner Kaz Daughtry was at all times a member of the NYPD. Defendant Daughtry is sued herein in his official and individual capacities.

ii.   NYPD Police Officer Ahmed N. Ali (NYPD Tax Registration Number 970381; Shield No. 64) was at all times alleged herein a member of the NYPD. Police Officer Ali is currently assigned to the PBBS Community Response Team. Police Officer Ali is sued herein in his official and individual capacities.

iii.   NYPD Sergeant Stanislav Kushnir (NYPD Tax Registration Number 947764), was at all times alleged herein a Sergeant with the NYPD. Sergeant Kushnir is currently assigned to the NYPD Vice Unit. Defendant Kushnir is sued herein in his official and individual capacities.

iv.   NYPD Detective Matthew Coffaro (Badge #3042) was at all times alleged herein a member of the NYPD. Detective Coffaro is currently assigned to PBBS Community Response Team. At the time of the incidents alleged in the Complaint, Detective Coffaro was an NYPD Officer with Shield No. 25515 assigned to the NYPD PBBS Specialized Units. Defendant Coffaro is sued herein in his official and individual capacities.

v.   NYPD members Jane and Joe Does 4-13. NYPD Member Does 4-13 were at all times relevant to this complaint members of the NYPD, in uniform,

4

working in their official capacities. The Doe Defendants are sued herein in their official and individual capacities. Plaintiff does not currently know the true names of the Doe Defendants, but describes them as follows:

a. Jane and John Does 4-13 appeared to be members of the Community Response Team (CRT). Jane and John Does 4-13 appeared to be wearing khaki pants with black or blue NYPD shirts. In addition:

b. John Doe #4 was wearing an NYPD helmet bearing number 64, and appeared to be a Caucasian man.

c. John Doe #5 was wearing khaki pants, a black or black NYPD shirt, a black vest that read "NYPD Police," and an NYPD helmet bearing number 25475. John Doe #5 appeared to be a Caucasian man. John Doe #5 used his baton to push Anastacia and other protestors to the ground as they were kettled.

d. John Doe #6 appeared to be a Caucasian man. He was wearing khakhi pants, a short sleeve black NYPD shirt, a black vest reading "NYPD Police," and a black helmet with no number. John Doe #6 was one of the NYPD officers who tackled Anastacia to the ground. John Doe #6 then repeatedly punched Anastacia about their body while Anastacia was on the ground and multiple officers pressed their body weight into Anastacia's.

e. John Doe #7, pictured below, appeared to be a Latino man of average height and build. He was wearing khakhi pants, a black NYPD shirt, and a black NYPD baseball cap.

5



f. John Doe #8, pictured below, appeared to be a Black man, approximately 5'10 – 6 ft tall, and of larger build. He had a black beard, and was wearing khakhi pants, a black NYPD shirt, and a black NYPD baseball cap.



g. John Doe #9, pictured below, appeared to be a Caucasian man of below average height and average build. He was wearing khaki pants, and a black NYPD shirt.

6



h. John Doe #10 wore an NYPD helmet bearing number 3316.

i. John Doe #11 was wearing a black NYPD helmet with no number.

j. John Doe #12 was wearing a black NYPD helmet with no number, and a black ski mask.

k. John Doe #14 was wearing a blue NYPD uniform, appeared to be of Hispanic descent, bald, in his 40s/50s.

12.     *Defendants related to the March 11, 2025 Incident:*

i. NYPD Police Officer Woodly Sainrose (Tax Registration No. 975790; Shield No. 3152) was at all times alleged herein a member of the NYPD. Police Officer Sainrose is currently assigned to the 81st Precinct. Police Officer Sainrose is sued herein in his official and individual capacities.

ii. NYPD Police Sergeant Joel Mottola (Tax Registration No. 950922; Shield No. 4982) was at all times alleged herein a member of the NYPD. Sergeant Mottola is currently

assigned to the PBMS Community Affairs Section. Sergeant Mottola is sued herein in his official and individual capacities.

13.     Each individual Defendant is sued in his or her individual and official capacities.

14.     The Defendants are NYPD members who unlawfully used excessive force, arrested, and/or detained Mx. Symone and others similarly situated in violation of their constitutional rights.

15.     At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD.  Some of their true names, as noted throughout this Complaint, are currently unknown to Mx. Symone.

16.     At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

17.     Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

18.     Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

19.     Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

20.    At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

21.    Although there was a reasonable opportunity to do so, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

## STATEMENT OF FACTS

### SEXUAL MISCONDUCT AND ABUSE BY MEMBERS OF THE NYPD

22.    Members of the NYPD have repeatedly engaged in sexually-based misconduct, violence, and harassment of civilians,[1] including during responses to protests such as Occupy Wall Street and Black Lives Matter demonstrations.

23.    For example, in *Perloff v City of New York et. al,* 1:13-cv-04175 (KBF)(S.D.N.Y), Plaintiff Perloff alleged that Defendant NYPD Sergeant Catapano grabbed her breast forcefully and intentionally while arresting her after she initially asked him not to touch her chest. Perloff's suit stated that this conduct was consistent with widespread sexual misconduct by police at the Occupy Wall Street demonstration at which her assault occurred.

24.    According to Perloff's attorney, "In his deposition, [Defendant NYPD Sergeant] Catapano stated that he had not received training on sex crimes since 2000 and that he believed

---

[1] *See* Joshua Kaplan & Joaquin Sapien, *NYPD Cops Cash in on Sex Trade Arrests with Little Evidence, While Black and Brown New Yorkers Pay the Price*, PROPUBLICA, Dec. 7, 2020, *available at*: https://www.propublica.org/article/nypd-cops-cash-in-on-sex-trade-arrests-with-little-evidence-while-black-and-brown-new-yorkers-pay-the-price; *see also* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him.* PROPUBLICA, Sept. 10, 2020, *available at:* propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop- of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him; Natasha Lennard, *In Secretive Hearing, NYPD Cops Who Raped Brooklyn Teen in Custody Get No Jail Time*, THE INTERCEPT, August 30, 2019, available at: https://theintercept.com/2019/08/30/nypd-anna-chambers-rape-probation/.

'you grab whatever means necessary to effect an arrest.'"[2] Additional lawsuits and accounts in the media similarly recognized and alleged the widespread use of sexual misconduct and/or battery, particularly groping the breasts of protestors, as a tactic by the NYPD at these demonstrations.[3]

25.     In 2018, The New York City Council introduced a host of bills that mandated sexual sensitivity and assault investigation training for members of the NYPD in the wake of information about the Department's treatment of sexual assault victims.[4] However, at a Council hearing in 2021, it was clear that these issues persisted.[5]

26.     The Defendants have been on notice about sexual misconduct by NYPD members and the need for training and discipline around these harms for years, but have failed to address these issues in any meaningful way. In fact, as in the case of Assistant Chief of NYPD Christopher McCormack, members who are accused of sexual misconduct often rise through the ranks.[6] McCormack has been accused by more than a dozen people of humiliating and abusive sexual conduct, including public strip searches and forcibly inserting his fingers into their anal cavities during legally prohibited "searches."[7]

27.     In 2018, the Civilian Complaint Review Board (CCRB) announced that the scope

---

[2] *See* Christopher Robbins, *OWS Protestor Who Had Her Breast Grabbed by NYPD Sergeant Gets $95,000 Settlement*, GOTHAMIST, Sep. 8, 2015, *available at:* https://gothamist.com/news/ows-protester-who-had-her-breast-grabbed-by-nypd-sergeant-gets-95k-settlement

[3] *See, e.g., Rechtschaffer v. The City of New York*, 13 Civ. 0709 (JPO) (S.D.N.Y.); Kathryn Funkhouser, *The Silencing of Cecily McMillan*, THE TOAST, April 14, 2014, *available at*: https://the-toast.net/2014/04/14/silencing- cecily-mcmillan/2/.

[4] *See* New York City Council (October 18, 2021) *Joint Hearing with Women and Equity and Public Safety*, minutes and video available at: https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=896997&GUID=54E40D2E-C083-4B1B-AB17-1328C10A783E&Search=; *see* John del Signore, *NYPD Cop Accused of Groping His "Favorite Rape Victim,"* GOTHAMIST, January 16, 2015, *available at*: https://gothamist.com/news/nypd-cop-accused-of-groping-his- favorite-rape-victim.

[5] *Id.*

[6] *See* Joaquin Sapein, Topher Sanders & Nate Schweber, *Over a Dozen Black and Latino Men Accused a Cop of Humiliating, Invasive Strip Searches. The NYPD Kept Promoting Him.* PROPUBLICA, Sept. 10, 2020, *available at:* https://www.propublica.org/article/over-a-dozen-black-and-latino-men-accused-a-cop-of-humiliating-invasive-strip-searches-the-nypd-kept-promoting-him.

[7] *Id.*

of the problem of sexual misconduct including assault by members of the NYPD necessitated an expansion of CCRB rules to allow the independent oversight agency to investigate such complaints, and the CCRB Board adopted this change by unanimous vote in February 2018.[8] For decades the CCRB had referred all sexual misconduct cases to the NYPD's Internal Affairs Bureau (IAB), requiring victims of NYPD-related sexual abuse to interface entirely with the NYPD itself, and no information about any investigations, discipline, or outcomes were made public.

28.    The NYPD's Patrolmen's (also Police) Benevolent Association moved to block this CCRB expansion.[11] Ultimately, after reintroducing the proposed rules in a manner consistent with the First Department's holding in *Lynch v Civilian Complaint Review Board*,[12] the agency officially undertook these investigations December 2020. Plaintiff incorporates by reference the information contained in the Civilian Complaint Review Board's data regarding the agency's investigations.[13]

29.    According to information provided at the CCRB's public Board Meeting on December 8, 2021, between the time investigations were initiated and the presentation at the December 8th meeting, the CCRB had received 233 complaints within its jurisdiction that included 335 allegations of sexual misconduct by members of the NYPD, and had referred 384 sexual misconduct cases to the IAB and District Attorneys for potential employment and criminal actions.[14] Of these referred cases, 266 were considered "Phase II," meaning they involved serious misconduct such as sexual assault and groping a person over their clothing.[15]

30.    As described below, the Plaintiff was groped by Defendant NYPD Defendant Sainrose who forcefully grabbed Plaintiff's genitals while Plaintiff was present at a protest for

---

[8] New York City Civilian Complaint Review Board, NYC Civilian Complaint Review Board Votes Unanimously to Investigate Allegations of NYPD Sexual Misconduct, via Press Release (February 15, 2018) available at https://www1.nyc.gov/assets/ccrb/downloads/pdf/about_pdf/news/pressreleases/2018/20181502_boardmtg_sexualmisconduct_release.pdf

Palestine, while other Defendant NYPD members stood beside Defendant Sainrose.

## MX. SYMONE'S EXPERIENCE ON MAY 6, 2023

31.     On May 6, 2023, Plaintiff was lawfully present at or near the intersection of 63rd Street and Third Avenue, in the County, City and State of New York.

32.     Plaintiff was lawfully present for a demonstration in support of Jordan Neely, a young, unhoused Black man who was killed while riding the subway.

33.     Defendant NYPD Captain Abraham Badillo (NYPD Tax Registration Number 936162) approached Plaintiff, grabbed them by the shirt, and dragged them into the street.

34.     Defendants Lt. Tony Ip, Sgt. Sasha H. Rosen, Lt. Lamarre, Detective Onabanjo, and Sgt. Marc. H. Assael assisted Lt. Badillo in throwing Plaintiff to the ground, causing Plaintiff's body to hit the pavement.

35.     One of the Defendants then kneeled on Plaintiff's side and back.

36.     Plaintiff was not engaged in any illegal or suspicious activity and there was no probable cause or legal basis for Defendants to arrest Plaintiff.

37.     Despite the absence of any basis for arresting Plaintiff, Defendants put three pairs of handcuffs on Plaintiff's wrists and formally arrested them.

38.     Plaintiff was visibly bleeding and requested medical attention, but Defendants did not provide medical attention to Plaintiff.

39.     Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendant to use any level of force on Plaintiff much less the level of force actually employed.

12

40.    Plaintiff informed the Defendants that Plaintiff is a woman.[9] Nonetheless, one of the Defendants, believed to be either Defendant Ip, Defendant Rosen, Defendant Lamarre, or Defendant Assael, who is a man, searched Plaintiff by putting his hands inside Plaintiff's pants and placed his finger on Plaintiff's anus.

41.    Defendants then placed Plaintiff in an NYPD transport vehicle and transported them to the stationhouse of a local area precinct.

42.    Rather than issuing Plaintiff a summons or other legal process on the street, NYPD members took Plaintiff to a centralized arrest processing location.

43.    Because NYPD members arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

44.    As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech, association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

45.    Plaintiff was detained for about 7 hours before Defendants released them from custody. Defendant Police Officer Jarvis Onabanjo, NYPD Tax Registration Number 959010, issued Plaintiff a Desk Appearance Ticket falsely charging plaintiff with a violation of NYPL §205.30, Resisting Arrest.

46.    The charges were ultimately dismissed in Mx. Symone's favor on grounds consistent with their innocence on June 13, 2023.

---

[9] At the time of the incident, Anastacia was a transgender woman. Anastacia has since de-transitioned.

47. The Defendants' conduct directly and proximately caused physical and severe emotional injury to Mx. Symone.

48. The Defendant's conduct unlawfully interfered with Mx. Symone's lawful protest and exercising of their First Amendment rights.

### MX. SYMONE'S EXPERIENCE ON APRIL 30, 2024

49. On April 30, 2024, Plaintiff was lawfully present at or near the intersection of West 139th Street and Amsterdam Avenue in the County, City, and State of New York when multiple NYPD members approached Plaintiff and subjected Plaintiff to excessive force.

50. Plaintiff was attending a protest of Israel's genocide of Palestinians in Gaza.

51. Defendants or other NYPD members instructed protesters to move to the sidewalk, and Plaintiff complied.

52. Once Plaintiff was on the sidewalk, NYPD members including the Defendants began kettling the protesters who were present on the sidewalk.

53. Plaintiff was not engaged in any violent or threatening behavior and there was no reason for Defendants to use any level of force on Plaintiff much less the level of force actually employed.

54. Plaintiff was not engaged in any illegal or suspicious activity and there was no probable cause or legal basis for Defendants to arrest Plaintiff.

55. Nonetheless, Plaintiff and other protestors were surrounded by police officers in front and to either side of them, with their back against the outside wall of a deli.

56. Protestors were trapped, with no opportunity to exit, in violation of the spirit—if not the letter—of a 2020 consent decree. See Stipulated Order, In Re:  New York City Policing During Summer 2020 Demonstrations, 20-cv-8924, ¶ 68  ("BLM Consent Decree").

14

57. As officers pushed Plaintiff and other protestors against the wall and each other, Plaintiff attempted to tell Defendants, including Defendant Commissioner Kaz Daughtry, that they could not move, and that they were already on the sidewalk.

58. In response Defendant Daughtry told Plaintiff to "shut up" and that they "would be next."

59. Plaintiff then heard Defendant Daughtry direct Defendant NYPD members to "start arresting them."

60. Suddenly, officers pushed Anastacia to the ground.

61. Only seconds after Anastacia stood up again, NYPD members, including John Does 4-13, Defendant Caffaro, Ali, and Kushnir, grabbed Anastacia, tackled Anastacia to the ground, and beat them.

62. Multiple officers piled atop of Anastacia, pressing their body weight into Anastacia's body and kneeling on Anastacia's neck.

63. Officers punched Anastacia in the back, neck and the head while dozens more officers watched.

64. At least one officer, John Doe #11, repeatedly punched Anastacia while Anastacia was pinned to the ground by multiple other Defendant officers.

65. Defendants then placed Anastacia in excessively tight handcuffs and aggressively pulled them up.

66. After Defendants lifted Anastacia up, multiple Defendants then slammed Anastacia to the ground and into a puddle of water, hitting Anastacia's mouth and causing it to bleed.

67. Defendants' assault against Plaintiff caused Plaintiff's shoe to come off and their pants to split open, such that their private areas were partially exposed.

15

68.    Defendants then placed Anastacia onto an NYPD transport vehicle.

69.    Defendants' assault against Mx. Symone caused them to suffer injuries to their mouth, arm, face, back, and neck.

70.    While in custody, and first at the scene of their arrest, Plaintiff requested medical attention from Defendants, including Defendants Coffaro and Ali.

71.    Defendants denied and unreasonably denied providing such attention to Plaintiff.

72.    Mx. Symone complained about the extremely tight cuffs but the members of the NYPD to whom Plaintiff complained did not take any steps to alleviate Plaintiff's overly tight handcuffs until Plaintiff was forced to endure the tight cuffs for an unreasonable amount of time.

73.    Rather than issuing Plaintiff a summons or other legal process on the street, Defendant members took Plaintiff to a centralized arrest processing location believed to be One Police Plaza.

74.    During Anastacia's second night in police custody, Anastacia experienced a mental health breakdown.

75.    After Mx. Symone repeated their request for medical attention, an NYPD member, John Doe #14, replied in sum and substance "you don't need medical attention, you should kill yourself."

76.    Because Defendants arrested Plaintiff in connection with a protest, they subjected Plaintiff to unreasonable and lengthy NYPD large-scale arrest processing, to which other similarly situated people detained by the NYPD for the same offense(s) with which Plaintiff was charged outside of the protest context are not subjected.

77.    As a result, that arrest processing unjustifiably and unreasonably lengthened Plaintiff's detention; curtailed and prevented Plaintiff from exercising Plaintiff's rights to speech,

16

association, and assembly, and to petition the government; cast a chill on Plaintiff's desire to participate in such protected expression in the future; and otherwise, injured and damaged Plaintiff.

78.      At no point during Plaintiff's many hours in custody did any member of the NYPD provide Plaintiff with another shoe or foot covering to replace their shoe which was removed during Defendants' assault of Plaintiff.

79.      Defendants took Plaintiff for psychiatric evaluation at Bellevue Hospital, which did not admit Plaintiff and discharged Plaintiff to Defendants' custody who then took them to New York County Central Booking.

80.      Defendants, including Defendant Coffaro, fabricated evidence, including about purported observations of Plaintiff's alleged pre-arrest conduct, created official NYPD paperwork based upon said fabricated evidence and/or forwarded such fabricated evidence to prosecutors and/or initiated charges against Plaintiff, relying on fabricated evidence and without probable cause.

81.      Specifically, Defendant Coffaro swore out a criminal complaint against Plaintiff bearing Docket Number CR-012516-24NY.

82.      In the Criminal Complaint, Defendant Coffaro falsely stated that he observed Plaintiff swinging an umbrella in the direction of Defendant Coffaro and other officers, and that Plaintiff struck Defendant Coffaro with their right fist. Defendant Coffaro further falsely stated that when he attempted to place Plaintiff under arrest, Plaintiff "threw [their] body to the ground," causing him to sprain his left shoulder.

83.      These allegations were false and Defendant Coffaro knew them to be false when he made them.

17

84.    Plaintiff was detained for several days based on Defendant Coffaro's false allegations.

85.    On May 2, 2024, after 41 hours, Plaintiff was arraigned on the criminal complaint containing the false allegations and was released from custody.

86.    Despite the false nature of Defendant Coffaro's allegations, he swore of the Criminal Complaint and forwarded it to the New York County District Attorney's office.

87.    Plaintiff was prosecuted pursuant to these false allegations for several months before the charges against them were dismissed on grounds consistent with their innocence.

88.    Specifically, Plaintiff's charges for assault in the second degree were dismissed in furtherance of justice, consistent with Plaintiff's innocence, on September 19, 2024.

89.    Plaintiff's charges for resisting arrest, obstruction of governmental administration, and attempted assault were all dismissed on speedy trial grounds, consistent with Plaintiff's innocence, on December 19, 2024.

90.    The Defendants' conduct directly and proximately caused physical and severe emotional injury to Mx. Symone's.

91.    The Defendant's conduct unlawfully interfered with Mx. Symone's lawful protest and exercising of their First Amendment rights.

**MX. SYMONE'S EXPERIENCE ON MARCH 11, 2025**

92.    On March 11, 2025, Plaintiff was lawfully present at or near Carl Schurz Park when Defendants arrived and approached Plaintiff.

93.    Plaintiff was present for a protest against Israel's genocide of Palestinians in Gaza.

94.    Plaintiff was not involved in any suspicious or illegal activity.

95.     Despite the absence of any probable cause to seize Plaintiff, Defendant Sainrose approached Plaintiff while Defendant Mottola watched.

96.     Plaintiff stated to Defendant Sainrose, in sum and substance, "Please don't touch me."

97.     Defendant Sainrose pushed Plaintiff into a fence using unreasonable and excessive force and grabbed and held onto Plaintiff's genitals.

98.     Defendant Mottola witnessed this and failed to intervene against the unconstitutional force from Defendant Sainrose against Plaintiff, despite having the opportunity to do so.

99.     Plaintiff also immediately complained to Defendant Mottola about Defendant Sainrose's sexual assault on them, and Mottola responded by stating, in sum and substance, "It's not sexual assault in New York. It's freedom of touch," before walking away.

100.    Plaintiff was not involved in any violent or threatening behavior and there was no reason for Defendant Sainrose to use any level of force against Plaintiff much less the level of force actually employed.

101.    The Defendants' conduct directly and proximately caused physical and severe emotional injury to Mx. Symone's.

102.    The Defendant's conduct unlawfully interfered with Mx. Symone's lawful protest and exercising of their First Amendment rights.

## THE NYPD'S POLICY AND/OR PRACTICE OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

103.    Defendants used types and levels of force that were excessive and unnecessary force against Mx. Symone.

104.    The uses of force against Mx. Symone were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

105.    However, that use of force was consistent with and ratified within the unwritten policies of the NYPD.

106.    In "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," an October 1, 2015 report published by the New York City Department of Investigation Office of the Inspector General for the NYPD ("OIG- NYPD")[10], the OIG-NYPD made several conclusions critical of the NYPD's then-extant use of force policies, including, *inter alia*, that:

    i.    NYPD's current use of force policy is vague and imprecise, providing little guidance to individual officers on what actions constitute force;

    ii.    NYPD's current procedures for documenting and reporting force incidents are fragmented across numerous forms, and officers frequently use generic language that fails to capture the specifics of an encounter;

    iii.    NYPD's patrol guide does not properly instruct officers to de-escalate encounters with the public;

    iv.    NYPD training does not adequately focus on de-escalation; and

    v.    In the period reviewed, NYPD frequently failed to impose discipline even when provided with evidence of excessive force. OIG-NYPD Report at pp. 3-5.

107.    After October 1, 2015, the NYPD revised its Patrol Guide provisions, and designed, created, and implemented training, to include "updated definitions concerning force, new policies regarding de-escalation, responsibilities of witness officers in use of force incidents, reporting obligations concerning force incidents, and data analysis on use of force incidents." *See* OIG- NYPD Report at p. 2 *et seq.*; *see*

---

[10] "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices," New York City Department of Investigation, Office of the Inspector General for the NYPD (October 1, 2015), *available at* http://www1.nyc.gov/site/oignypd/reports/reports.page ("OIG-NYPD Report") (last accessed April 1, 2022).

20

*also* NYPD Patrol Guide Section 221-01[11] ("Force Guidelines") and 221-02[12] ("Use of Force"), issued and effective June 27, 2016 (implementing changes to NYPD use of force policies in the form of revised written guidelines, incorporated into the NYPD's Patrol Guide).

108.    Under those revised NYPD written policies and procedures, NYPD members who use force are required to file written Threat, Resistance, and Injury ("TRI") reports when they use certain force, including, but not limited to, hand strikes, foot strikes, forcible take-downs, impact weapons (such as batons), and/or force that causes physical injuries, including bruising or swelling and the like. And supervisors are also required to conduct investigations and fill out TRI reports related to such uses of force.[13]

109.    Upon information and belief, Defendants failed to document, and/or require that fellow Defendants and/or other fellow NYPD members document and failed to investigate and/or supervise fellow NYPD members regarding, uses of force in accordance with related NYPD policies and/or training.

110.    Defendants used force that they knew, or should have known, would negatively impact Mx. Symone, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether these uses of force were necessary, justified, or reasonable under these circumstances.

**THE NYPD'S VIOLENT RESPONSE TO PROTESTS FOR BLACK LIVES IN 2020**

111.    Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

---

[11] Available online via the New York City Civilian Complaint Review Board ("CCRB") website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-01-force-guidelines.pdf.
[12] Available online via the New York City Civilian Complaint Review Board website at http://www.nyc.gov/html/ccrb/downloads/pdf/2016pg/pg221-02-use-of-force.pdf.
[13] "Use of Force: Revised NYPD Policy," NYPD Use of Force Update- June 2016 (June 2016), at pp. 4-5, *available at* https://www.prisonlegalnews.org/media/publications/Use%20of%20Force%20-%20Revised%20NYPD%20Policy%20Booklet,%20NYPD,%202016.pdf ("NYPD Use of Force Update") (last accessed April 1, 2022) (footnotes omitted).

112.       For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned, and enforced by Defendant City and policymaking officials.

113.       On June 17, June 18, and June 22, 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[14]

114.       The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protests. [15]

115.       The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[16]

116.       The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [17]

117.       Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research,[18] a 99-page report providing a detailed account of the NYPD's

---

[14] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[15] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

[16] *Id.* at 35.

[17] *Id.* at 56.

[18] US: New York Police Planned Assault on Bronx Protesters - *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/video-photos/video/2020/09/30/us-new-york-police-planned-assault-bronx-protesters-animation

response to the June 4 peaceful protest in Mott Haven—a low-income neighborhood populated mostly by minorities, that has experienced high levels of police brutality and ingrained systemic racism.[19]

118.    On June 4, 2020, thousands of police officers surrounded and trapped protesters in Mott Haven, employing a tactic known as "kettling." Officers then beat kettled protestors with their batons and used pepper spray on them before arresting over 250 peaceful protestors.

119.    Further reports and videos taken at that protest event show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

120.    The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[20]

121.    Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

122.    *The People of the State of New York v. City of New York et al*, 21-cv-322 (CM)(GWG); *Rolon et al. v. City of New York, et al.,* 21-cv-02548(CM); *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG) and *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (CM)(GWG) resulted in a settlement promising substantial reforms to the NYPD's policing of first amendment activities including training, practices, and supervision.[21]

123.    Yet, even on the heels of a settlement promising sweeping changes to police tactics related to policing demonstrations arising from the use of excessive force and other abusive tactics during the Black

---

[19] "Kettling" Protestors in the Bronx – *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf
[20] *US: New York Police Planned Assault on Bronx Protesters*, HUMAN RIGHTS WATCH (2020), available at https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters.
[21] Stipulated Order, *In re New York City Policing During Summer 2020 Demonstrations*, 20-cv-8924, ECF No. 1099-2.

Lives Matter protests in the summer of 2020 and in 2021, the NYPD has continued to engage in actions related to policing demonstrations such as the ones described herein, violating Plaintiff's constitutional and other rights.

## THE NYPD'S FAILURE TO TRAIN REGARDING POLICING PROTESTS

124.     Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

125.     In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

126.     In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

127.     Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

128.     The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro- active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

129.     Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

130.     These disperse and demoralize tactics and trainings have persisted through the present.

131.     Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

24

132.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

133.    On information and belief, there was, and is, virtually no NYPD training—and certainly no meaningful NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

134.    Defendants' failures to train, which led to violations of Plaintiffs' rights in this case, include, *inter alia*, the following:

   i.    The failure to train, instruct, and discipline officers to discourage and prevent misconduct and assault by NYPD members;

   ii.    The failure to make clear the need to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

   iii.    The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

   iv.    The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead training focused almost exclusively on tactics designed to "disperse and demoralize" protesters; and

   v.    The failure to ensure police response to protests and other protected activities are not based on the content thereof.

   vi.    The failure to ensure police response to protests and other protected activities are not based on the appearance, nationality or culture of protestors.

135.     Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and undisciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

136.     The SRG was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

137.     The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

138.     In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling protests and demonstrations. They'll have no role in protests. Their response is single fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[22]

139.     However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the George Floyd protests, and in pro-Palestine protests around the city, such as the ones described herein.[23] [24]

140.     Many SRG members, including those deployed to the protest in this case, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[25]

---

[22] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns,* Gothamist, Jan. 30, 2015, available at https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine- guns.

[23] Council on American-Islamic Relations, *CAIR-NY Calls on New York City Council to Disband the NYPD SRG, Invest in Community Programs Instead*, Mar 21, 2024, available at https://www.cair- ny.org/news/2024/3/21/cair-ny-calls-on-new-york-city-council-to-disband-the-nypd-srg-invest-in- community-programs-instead (reporting that from January 2024 to March 2024, the SRG been deployed to 205 peaceful protests since January, most of which were pro-Palestine protests).

[24] The New York Civil Liberties Unit, ACLU of New York, NYCLU on NYPD Violence at Pro-Palestine Protest in Bay Ridge, May 19, 2024, available at https://www.nyclu.org/press-release/nyclu-on-nypd-violence-at-pro-palestine-protest-in-bay-ridge.

[25] Ali Winston, NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct Histories, The Appeal, Oct. 15, 2020, available at https://theappeal.org/nypd-srg-misconduct.

141.    SRG members are meant to have additional DCU training.

142.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

143.    However, the City of New York has admitted that many of the officers deployed to respond to protests did not even receive that training, which was supposedly required of them.

144.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protest was limited to what they had received as recruits in the Academy.[26]

145.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with disperse and demoralize while policing protests; documented in complaints to the Civilian Complaint Review Board and other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

146.    Nevertheless, upon information and belief, at all times relevant herein, City policymakers routinely received reports regarding arrests made in connection with First Amendment assemblies. These internal reports include Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

---

[26] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 37.

147.     Despite the wealth of evidence of NYPD members' historic brutality against protesters, Defendant City has ignored, and/or failed to utilize relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

148.     At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years— demonstrates both a history and a policy of disregard for the First Amendment, Fourth Amendment, Fifth Amendment, Fourteenth Amendment, and other, related rights of Plaintiffs and other similarly injured protesters.

149.     Finally, upon information and belief, under the guise of combatting antisemitism, members of the NYPD have received protest training that is Islamophobic, Anti-Arab, and anti-Palestinian.

150.     Through this training, members of the NYPD are taught that symbols of Palestinian and Arab identity are antisemitic, and that they should prosecute them accordingly.[27]

**THE NYPD'S TRAINING TARGETS PRO PALESTINE CONTENT**

151.     Upon information and belief, and under the pretextual guise of combating antisemitism, members of service receive training that is Islamophobic, antisemitic, and anti-Palestinian. The training is created by the "Combat Antisemitism Movement," an explicitly pro-Israel and anti-Palestinian organization.

152.     Indeed, current NYPD Commissioner Jessica Tisch offered opening remarks at a recent "Combat Antisemitism Movement" session.

---

[27] Kane, *supra* n. 11.

153.     Upon information and belief, said training, which thousands of members of service have sat for, declares the following false, discriminatory, and bias statements that fuel the NYPD's violent response to protest centered around Palestine:

i.     "Islamism is a political ideology where Islamic law overrides the Law of Man";

ii.     "Jihadism is a subset of Islam that uses violence to impose Islamic Law"

154.     Upon information and belief, the training includes a racist cartoon depicting people from the Middle East in a "Suicide Bombing Class" taking "Human-Bomb Course-Work" wherein the instructor, donning a beard and turban, is wrapped in explosives.

155.     Upon information and belief, the training characterizes students protesting in support of Palestine as "young bored and looking for purpose" thus leading them to become "extremists."

156.     Upon information and belief, the training designates student groups, such as Students for Justice in Palestine, as extremists, and insists that a call for "the liberation of Palestine from the River to the Sea" is antisemitic.

157.     Upon information and belief, while claiming to be a training on antisemitism, the training focuses solely on false, racist, bias, and discriminatory claims about Muslims, Islam, and the movement for Palestinian liberation, a movement that is diverse and fortresses support from all sectors of global society, including people of the Jewish faith.

158.     Upon information and belief, the training declares the Kuffiyeh, a traditional headdress worn by men from parts of the Middle East, as a symbol of antisemitism.

159.     However, the Kuffiyeh is a scarf with patterns representing Palestinian history and culture. The dark black strips on the edges represent the historical trade routes through Palestine. The fishnet-like pattern is a reference to Palestinians' connection to the Mediterranean Sea. Lastly, the curved lines reflect olive trees, a symbol of Palestinian heritage and a main export product of the land. The Kuffiyeh has been worn by Palestinians for generations, long before the creation of the State of Israel.

29

160. Upon information and belief, the training further declares that a watermelon is a symbol of antisemitism. In reality, Palestinians adopted the watermelon in response to Israel banning the display or possession of the Palestinian flag, since it presented the same colors – Red, Green, White, and Black.[28]

161. Upon information and belief, perhaps most absurdly, the training also declares that the use of "red hands"—a symbol for having blood on one's hands, or for being responsible for the murder of civilians, is antisemitic.

162. Upon information and belief, the training also declares the following phrases to be antisemitic:

    i. "From the River to the Sea, Palestine Will be Free;"

    ii. "There is only one solution, Intifada Revolution, Globalize the Intifada;"

    iii. "All Eyes on Rafah;" All Eyes on Rafah is a slogan that was popularized on social media in early 2024, "meant as a request for bystanders to not look away from what's happening in the city of Rafah—where as many as 1.4 million people are sheltering after fleeing from violent fighting elsewhere in Gaza—as Israel continues its offensive despite the large civilian population." The slogan stems from a comment by the Director of the World Health Organization in response to Israeli Prime Minister Benjamin Netanyahu's evacuation order for the city's entire population.[29]

    iv. "Zionism is Racism;" and

    v. "Settler Colonialism."

163. Upon information and belief, members of the NYPD are directed to use the examples of antisemitism in the training, train officers on said symbols, publicly condemn antisemitism, and prosecute accordingly.

---

[28] Anna Furman, "How Watermelon Imagery, a symbol of solidarity with Palestinians, spread around the planet" Associated Press, Jan 18, 2024, available at https://apnews.com/article/israel-palestinians-gaza-watermelon-symbol-protests-832c9a21b82015356f0ef99d17df2633

[29] Mary Whitfill Roeloffs, "'All Eyes On Rafah' Slogan Spreads On Social Media: What To Know About Its Origins" Forbes Magazine, May 28, 2024, available at https://www.forbes.com/sites/maryroeloffs/2024/05/28/all-eyes-on-rafah-slogan-spreads-on-social-media-what-to-know-about-its-origins/.

## FIRST CLAIM FOR RELIEF

### Unlawful Seizure / False Arrest Regarding All Three Incidents

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

164. Mx. Symone incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

165. Defendants' seizures of Mx. Symone herein were done without any judicial warrant authorizing them to seize Mx. Symone, was unreasonable, and were done without privilege or lawful justification.

166. Mx. Symone did not consent and was conscious of their confinement by Defendants.

167. Defendants did not have individualized probable cause to seize, detain, or arrest Mx. Symone.

168. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

169. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF

### Excessive Force Regarding All Three Incidents

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

170. Mx. Symone incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

31

171. Defendants' uses of force against Mx. Symone were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

172. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

173. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

### First Amendment Regarding All Three Incidents

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone' Rights Under the First and Fourteenth Amendments to the United States Constitution*

174. Mx. Symone incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

175. Defendants imposed restrictions on such protected speech and/or conduct that violated Mx. Symone's First Amendment right, including, but not limited to, in falsely arresting Mx. Symone, in subjecting Mx. Symone to excessive force, in selectively enforcing laws and regulations against Mx. Symone, and in otherwise violating Mx. Symone's rights and engaging in the acts and omissions complained of herein.

176. In addition to being retaliatory, the restrictions Mx. Symone complains of herein, which Defendants imposed on Mx. Symone' First Amendment right to participate in, observe, and/or stand nearby, speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Mx. Symone's protected conduct that:

a.      Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.      Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Mx. Symone's protected expression, including in that Mx. Symone's abilities to communicate effectively were threatened; and/or

c.      Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Mx. Symone' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.      Amounted to the imposition of strict liability on Mx. Symone for engaging in protected speech and/or expression.

177. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

178. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**FOURTH CLAIM FOR RELIEF**

**First Amendment Retaliation Regarding All Three Incidents**

33

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone' Rights Under the First and Fourteenth Amendments to the United States Constitution*

179. Defendants retaliated against Mx. Symone for engaging in speech and/or conduct protected by the First Amendment.

180. Defendants engaged in the acts and omissions complained of herein in retaliation for Mx. Symone's protected speech and/or conduct.

181. Defendants engaged in the acts and omissions complained of herein in order to prevent Mx. Symone from continuing to engage in such protected speech and/or conduct.

182. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Mx. Symone from engaging in similar protected conduct in the future.

183. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Mx. Symone to violations of their First Amendment right.

184. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Mx. Symone' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

185. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Mx. Symone' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Mx. Symone.

34

186. Additionally, some of the offenses charged against Mx. Symone, which Defendants might argue provided probable cause for Mx. Symone' arrest, were offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

187. Mx. Symone suffered actual chill, including in that Mx. Symone was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

188. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Mx. Symone subjected Mx. Symone to the violations of their First Amendment right described elsewhere herein.

189. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

190. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

### Due Process Regarding All Three Incidents

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone' Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution*

191. Mx. Symone incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

192. As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Mx. Symone violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on ad hoc determinations, often without fair warning.

193. Additionally, as discussed elsewhere herein, Defendants City, including by its officials designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Mx. Symone's property and/or detaining Mx. Symone in the conditions as described subjected Mx. Symone to the violations of their Due Process rights described elsewhere herein.

194. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

195. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

196.

## SIXTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights Regarding the May 6, 2023 Incident and

### April 30, 2024 Incidents

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Mx. Symone' Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution*

36

197. Mx. Symone incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

198. Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Mx. Symone suffered liberty deprivations and other injuries.

199. Defendant Onabanjo knowingly and intentionally transmitted false information to the New York County District Attorney by signing a desk appearance ticket falsely stating that Mx. Symone engaged in obstruction of governmental administration.

200. Defendant Coffaro knowingly and intentionally transmitted false information to the New York County District Attorney by signing a criminal complaint, as alleged above, falsely stating that he observed Plaintiff swinging an umbrella in the direction of Defendant Coffaro and other officers, and that Plaintiff struck Defendant Coffaro, and caused Defendant Coffaro to fall to the ground causing him to sprain his left shoulder.

201. These statements were untrue, were communicated to a prosecutor, and were likely to influence the decision of any jury weighing the evidence presented in a prosecution of Mx. Symone.

202. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

203. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**Malicious Prosecution Regarding the May 6, 2023 and April 30, 2024 Incidents**

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution*

204. Mx. Symone incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

205. Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

206. Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Mx. Symone, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

207. Defendants lacked probable cause to initiate and continue criminal proceedings against Mx. Symone.

208. Defendants acted with malice in initiating criminal proceedings against Mx. Symone.

209. Notwithstanding Defendants' misconduct, the criminal proceeding against Mx. Symone were favorably terminated as alleged above in the facts sections of this complaint.

210. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

211. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**EIGHTH CLAIM FOR RELIEF**

38

**Violation of New York City Administrative Code § 8-802**

**Deprivation of Rights Regarding All Three Incidents**

212. Mx. Symone repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

213. The acts of Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

214. The acts of Defendant Officers caused Mx. Symone to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against unreasonable search and seizure.

215. The acts of Defendant Officers caused Mx. Symone to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against the use of excessive force in connection with Defendants' search and seizure of Mx. Symone.

216. The Defendant Officers, while in uniform, unlawfully seized, searched and arrested Mx. Symone in violation of N.Y.C. Admin. Code §§ 8 – 802.

217. As a result of the foregoing, Mx. Symone was deprived of their liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was incarcerated and forced to incur legal expenses and costs to defend themselves and obtain their liberty, was caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to their arrests.

39

218. As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of respondeat superior, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

## NINTH CLAIM FOR RELIEF

### Violation of New York City Administrative Code § 8-803

### Failure To Intervene Regarding All Three Incidents

219. Mx. Symone repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

220. The acts of all Defendant Officers constituted conduct under color of the laws of the State of New York, under color of the laws, rules, and regulations of the City of New York, and under color of the customs and usages of the City of New York and of the New York City Police Department.

221. The failure of Defendant Officers to intervene, in violation of N.Y.C. Admin. Code § 8 – 803, caused Mx. Symone to be deprived of their rights, as they are granted and guaranteed to him by N.Y.C. Admin. Code § 8 – 802, to be secure in their person against unreasonable search and seizure.

222. The failure of Defendant Officers to intervene caused Mx. Symone to be deprived of their rights, as they are granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802, to be secure in their person against the use of excessive force in connection with Defendants' searches and seizures of Mx. Symone.

223. The failure of the Defendant Officers to intervene while other Defendant Officers unlawfully seized, searched and arrested Mx. Symone, caused Mx. Symone to be deprived of the

40

right to be secure against such illegal acts as it is granted and guaranteed to them by N.Y.C. Admin. Code §§ 8 – 802.

224. As a result of the foregoing, Mx. Symone was deprived of their liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was incarcerated and forced to incur legal expenses and costs to defend themself and obtain their liberty, was caused to feel unwell during the arrest processing and suffered embarrassment and pain and suffering during and due to their arrests.

225. As a result of the above conduct, the City of New York is liable, under New York City Administrative Code § 8-803(b) and under the doctrine of respondeat superior, for the conduct of the Individual Defendants, and for any damages the Individual Defendants caused by and through their conduct.

## TENTH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to March 11, 2025 Incident

### False Arrest, False Imprisonment, and Unreasonable Detention

226.    Plaintiffs incorporate by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

227.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

228.    In performing the actions and behaviors described above, Defendants did falsely detain Plaintiffs within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so.

229.     Plaintiffs additionally were each conscious of the confinement and were confined without their consent.

230.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## ELEVENTH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to March 11, 2025 Incident

### Assault

231.     Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

232.     The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

233.     Defendants committed assault within the meaning of New York common law against Plaintiffs by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

234.     Defendants did thereby inflict assault upon Plaintiffs.

235.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering,

psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## TWELVETH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to March 11, 2025 Incident

### Battery

236.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

237.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

238.    Defendants committed battery within the meaning of New York common law against Plaintiffs by intentionally physically contacting Plaintiff without Plaintiff's consent.

239.    Defendants did thereby inflict battery upon Plaintiff.

240.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

## THIRTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to March 11, 2025 Incident

### Intentional and Negligent Infliction of Emotional Distress

43

241.    Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

242.    The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

243.    In performing the actions and behaviors described above, Defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Plaintiffs.

244.    The acts and conduct of Defendants were the direct and proximate cause of injury and damage to Plaintiff and violated Plaintiff's statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

245.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

## FOURTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to March 11, 2025 Incident

### Negligent Training and Supervision

246. Upon information and belief, Defendant City supervised, and trained the police officials described above.

247. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

44

## FIFTEENTH CLAIM FOR RELIEF

### Violations of the New York State Constitution Related to March 11, 2025 Incident

248.     Plaintiff incorporates by reference all the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

249.     The conduct of officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police and law enforcement officials, and/or while they were acting as agents and employees of Defendant City, cloaked with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

250.     Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 3, 6, 8, 9, 11, and/or 12 of the New York State Constitution.

251.     A damages remedy here is necessary to effectuate the purposes of Article I, §§ 3, 6, 8, 9, 11, and/or 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

## SIXTEENTH CLAIM FOR RELIEF

### Violations of New York State Common Law Related to April 30, 2024 and

### March 11, 2025 Incidents

### Malicious Prosecution

252. Defendants commenced criminal proceedings against Mx. Symone maliciously and without probable cause.

253. As a result of Defendants' acts and omissions, Defendants deprived Mx. Symone of their federal, state, and/or other legal rights; caused Mx. Symone bodily injury, pain, suffering,

45

psychological and/or emotional injury, and/or humiliation; caused Mx. Symone to expend costs and expenses; and/or otherwise damaged and injured Mx. Symone.

254. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

255. Mx. Symone hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

256. WHEREFORE, Mx. Symone demands judgment against the individual Defendants and the City of New York as follows:

a. Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

b. Actual damages in an amount to be determined at trial against the City of New York, and punitive damages to be determined at trial pursuant to N.Y.C. Admin. C. § 8-805(1)(ii), and N.Y.C. Admin. C. § 14-189;

c. An appropriate restraining orders or injunctions pursuant to N.Y.C. Admin. C. § 8-805(3), and N.Y.C. Admin. C. § 14-189(c)(3);

d. Appropriate additional injunctive relief as may be determined at trial;

e. Statutory attorney's fees, disbursements, and costs of the action pursuant to, inter alia, 42 U.S.C. § 1988, N.Y.C. Admin. L. § 8-805(2), N.Y.C. Admin. C. § 14-189, and New York common law;

f. Expert costs and fees pursuant to N.Y.C. Admin. C. § 14-189(c)(4); and

g. Such other relief as the Court deems just and proper.

46

Dated:    Brooklyn, New York

April 23, 2026


**COHEN&GREEN P.L.L.C.**

*Jessica Massimi*
_____
By:

Jessica Massimi
Leena Mohmoud Widdi
1639 Centre Street, Suite 216
Ridgewood, NY
t: (929) 888-9480
f: (929) 888-9457
leena@femmelaw.com


**GIDEON ORION OLIVER**

*Gideon Orion Oliver*
_____
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**THE ABOUSHI LAW FIRM PLLC**

_____
Tahanie A. Aboushi
1441 Broadway, 5th Floor
New York, New York 10018
Tel: (212) 391-8500
Tahanie@Aboushi.com


*Attorneys for Plaintiff*